UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA HAMMACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16 CV 1592 (JMB) |
| | ) | |
| NANCY A. BERRYHILL,[1] Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's decision is reversed and the matter is remanded.

## I. Procedural History

In July and August 2013, plaintiff Teresa Hammack filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of August 30, 2004. (Tr. 172-80, 181-86). After plaintiff's applications were denied on initial consideration (Tr. 50-59, 60-65), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 80-81).

Plaintiff appeared for a video hearing with counsel on August 25, 2015,[2] and testified concerning her disability, daily activities, functional limitations, and past work. (Tr. 27-42). The

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

ALJ also received testimony from vocational expert Jerry Beltramo, D. Min. The ALJ issued a decision denying plaintiff's applications on September 4, 2015. (Tr. 9-26). The Appeals Council denied plaintiff's request for review on August 11, 2016. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born on January 23, 1965, and was 48 when she filed her applications and 50 when the ALJ issued his decision. She completed two years of college and could read, write, and complete simple math. (Tr. 30-31). She owned and operated a janitorial business between 1994 and 2003. In addition to performing janitorial functions, she supervised between 4 and 30 employees, managed hiring and firing, promoted the business, and handled payroll, billing, and accounts receivable. (Tr. 210-11). She stopped working due to her impairments. (Tr. 209).

Plaintiff listed her impairments as generalized anxiety disorder, chronic schizoaffective disorder with acute exacerbation, and recurrent major depressive disorder. (Tr. 31, 209). She had psychiatric admissions in 1985 and July 2014. (Tr. 31). She received psychiatric treatment from psychiatrist Deborah B. Krause, D.O. (Tr. 35). Between August 2013 and August 2015, plaintiff was prescribed a number of psychotropic medications, including lithium carbonate, loxapine, paroxetine, clonazepam, and Latuda. She also took levothyroxine for the treatment of hypothyroidism. (Tr. 212, 324, 342).

Plaintiff's neighbor Mary White completed a third-party function report in August 2013. (Tr. 217-27). According to Ms. White, plaintiff had taken care of her elderly mother for several

---

[2] Plaintiff and counsel initially appeared on December 12, 2014. (Tr. 43-49). The ALJ determined that a psychological consultative examination was required and continued the hearing. (Tr. 48).

years until her death in November 2012. The loss of her mother and her inability to work caused plaintiff's conditions to worsen to the point that she was unable to take care of her daily chores. Sometimes plaintiff had insomnia and, at other times, she slept "all the time." (Tr. 218). Ms. White and her husband spent between two and six hours every day with plaintiff, making sure she ate two meals and took her medications. Plaintiff had periodic panic attacks and was sometimes afraid to go outside. She did not like to go out on her own, but she did go to church with Ms. White and participate in the service. She liked to take walks, do yard work, and visit with neighbors. Plaintiff stated in her own function report (Tr. 230-38) that when she was really depressed she did not care if she ate and that she had difficulties with talking, memory, completing tasks, concentrating, understanding and following instructions, while Ms. White opined that plaintiff followed written instructions quite well. Both Ms. White and plaintiff stated that plaintiff got along well with others, with the exception of plaintiff's brother. The Field Office interviewer described plaintiff as "confused and irritated" and observed that plaintiff had difficulty with understanding, coherence, concentration, talking, and answering. (Tr. 206).

Plaintiff lived alone in August 2013 when she filed her applications but planned to move in with a roommate in the near future. (Tr. 231). In describing her daily activities, plaintiff stated that she napped in the mornings and afternoons and watched television. She tried to walk with a friend, but was often unable to leave her house. She considered any day she went outside to be "a good day." (Tr. 231). In October 2013, plaintiff reported to the State agency that she showered infrequently because she had hallucinations of things coming out of the shower head. She also did not wash the dishes and just let them pile up until someone else washed them for her. She stated that since her last disability report she had begun to avoid going into public or crowded situations and that she got very behind on laundry. (Tr. 245).

At the August 2015 hearing, plaintiff reported that she had stopped taking the antipsychotic Latuda while undergoing antibiotic treatment for a peptic ulcer but expected to resume in a few days at an increased dosage. (Tr. 32). When she was taking her antipsychotic medications, she had four or five good days every week. (Tr. 34). On such days, she woke up at 8:00, had breakfast, walked the dog and fed the cats, and "tr[ied] to stay out of bed as much as possible." (Tr. 33). Even on good days, it was hard for her to leave the house, so she made excuses to stay home. She was responsible for the majority of the housework in exchange for rent and washed dishes, cleaned the floors, and changed litter boxes. (Tr. 34). When she felt up to it, she prepared meals for herself and her roommate. She was able to watch television on good days, and sometimes was able to watch an entire hour-long show; other times, she got distracted or lost interest after 10 or 15 minutes. (Tr. 35-36). She liked to do yard work when her roommate was willing to be outside with her. (Tr. 36). On bad days, such as when she could not take her antipsychotic medications, she wanted to sleep to avoid the anxious and depressed feelings. She got up for an hour around 10:00 or 11:00 and then slept until 5:00 or 6:00 before getting up to eat supper. She then stayed awake until 9:00 before returning to bed. (Tr. 33-34). She did not watch television on those days. (Tr. 38). She testified that she had recently experienced paranoid thoughts while at Wal-Mart and left her cart in the aisle and went home. (Tr. 37). The medications caused generalized sleepiness, dry mouth, upset stomach and occasional diarrhea, but she was willing to deal with the side effects in order to control her psychotic episodes. (Tr. 33).

Vocational expert Jeremy Beltramo was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform work at all exertional levels but who was limited to performing simple work

as defined in the Dictionary of Occupational Titles as specific vocational preparation (SVP) levels one and two – which the ALJ defined as routine tasks with only occasional decision-making, only occasional changes in the work setting, and no strict production quotas, emphasizing a per shift rather than per hour basis. (Tr. 40). In addition, the hypothetical individual was limited to only occasional interaction with the public, coworkers, and supervisors. Such an individual would not be able to perform plaintiff's past relevant work, but could perform other work that was available in the state and national economy, including stubber, machine packager, and industrial cleaner. (Tr. 40-41). Each of these jobs had an SVP level of two. An individual who was unable to concentrate for more than 30 minutes at a time, was off-task 20 percent of the workday, or had more than two unexcused absences in a month or repeated tardiness would not be employable.

### B. Medical Evidence

The largest portion of the medical evidence in this case consists of psychiatric treatment records from Dr. Krause from November 2007 through August 2015.[3] In addition, there are records from plaintiff's inpatient admission in July 2014. The opinion evidence consists of a Psychiatric Review Technique form completed by the State agency psychologist in September 2013, medical source statements completed by Dr. Krause in April 2014, and a psychological evaluation completed by Thomas J. Spencer, Psy. D., in January 2015.

### 1. Treatment Records

In March 2007, plaintiff underwent a new patient evaluation at University Hospital in Columbia, Missouri, with the goal of enrolling in a patient assistance program for her

---

[3] Plaintiff did not have treatment between August 2008 and March 2013 while she was caring for her mother. (Tr. 287).

medications. Plaintiff reported that she experienced highs and lows, with symptoms of mania and depression, and auditory command hallucinations telling her to kill herself. She had about 20 prior suicide attempts, through attempted drowning and overdoses. She slept 18 to 20 hours a day, and had poor appetite, decreased motivation and energy, crying spells, poor concentration, feelings of guilt and worthlessness, distractibility, derealization, and depersonalization. She had been treated by a psychiatrist in St. Louis, but he no longer offered a patient assistance program for her prescriptions, which included Lexapro, Abilify, BuSpar, Wellbutrin, and Klonopin. On examination, plaintiff was alert and oriented, with good eye contact. Her hygiene was fair. She appeared anxious with restricted affect. She was diagnosed with schizoaffective disorder, bipolar type, and assessed as moderately ill. She was referred to counseling services

Plaintiff established services with Dr. Krause at the University of Missouri Center for Mental Wellness in Jefferson City on November 15, 2007.[4] (Tr. 291-93). She reported that she was hospitalized in her late teens for suicidal ideation. She began experiencing daily auditory and visual hallucinations as a teenager, but she did not report them to anyone until 2005 because she did not know that hallucinations were unusual. In 2004, she shut down the commercial cleaning business she had operated for 12 years, keeping one account that she worked for when she was able. She described a prior long-term relationship but was not presently involved with anyone.[5] Plaintiff stated that she experienced mood swings. During depressive phases, she

---

[4] The Court sets forth Dr. Krause's findings in some detail for two reasons. First, while the format of her notes changed over time, the notes generally included plaintiff's report on her present condition and her response to medication, a review of systems, and a mental status examination. Second, Dr. Krause found it necessary to adjust plaintiff's medications at all but three appointments, an indication that controlling symptoms and decreasing side effects was not a simple matter.

[5] Plaintiff later explained that the relationship ended when she began to provide more care for her mother. (Tr. 330).

experienced low mood, anhedonia, anergia, hypersomnia, social isolation, insomnia, and severe suicidal thoughts. And, during manic phases, she experienced decreased sleep and increased energy, elevated mood, an inability to complete tasks, and excessive cleaning.[6] Plaintiff's prior psychiatric treatment ended in January 2007 when she lost medical insurance. She continued to take her prescribed medicine even though she did not feel she was getting much benefit. She smoked a pack of cigarettes a day and used methamphetamine two or three times a month. She denied using alcohol. On examination, plaintiff presented with good hygiene and grooming, was cooperative and interactive, made good eye contact, and did not have psychomotor abnormalities or pressured speech. She was alert and oriented, her thought processes were linear, and she had good insight and judgment. Her diagnoses were schizoaffective disorder, methamphetamine abuse, and nicotine dependence. Her Global Assessment of Functioning (GAF) score was 50.[7] Dr. Krause continued plaintiff's prescriptions for Lexapro, BuSpar, Wellbutrin, and Klonopin (as needed); discontinued plaintiff's Abilify; started a trial of Invega to address hallucinations; and started a trial of Depakote to target mood swings and manic and depressive episodes. She also ordered comprehensive blood tests.

In December 2007, plaintiff reported that she had been unable to afford the blood tests. (Tr. 305-07). Her mother had moved in with her for mutual support during the winter. She had stopped taking Invega and Depakote after three days because of unpleasant side effects. She

[6] For example, during a manic phase she was unable to finish cooking dinner because, once she opened a kitchen drawer, she felt compelled to reorganize it before returning to her meal preparation.

[7] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000) (DSM-IV-TR). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

reported that her mood swings were increasing in frequency. She had several days of depression but now was entering a manic phase — she was unable to sleep and felt edgy, wired, and nervous. She presented with significant involuntary facial movements, which she said began when she first took Abilify. She continued to experience auditory hallucinations.[8] She denied any methamphetamine use since her last visit. On examination, plaintiff presented with good hygiene and grooming, was pleasant, cooperative and interactive, and made good eye contact. She had significant involuntary facial movements and lip smacking throughout the visit. She was alert and oriented, her thought processes were linear, and she had good insight and judgment. Her diagnoses remained unchanged. Plaintiff agreed to retry Depakote. Dr. Krause delayed prescribing Seroquel to address plaintiff's ongoing psychotic symptoms until baseline blood work was completed. Plaintiff called on December 11, 2007, to report an extended period of feeling manic with an inability to focus. Dr. Krause changed the dosage of plaintiff's Wellbutrin and added clonazepam. (Tr. 308).

On January 7, 2008, plaintiff reported mood swings with significant alteration in her sleeping. (Tr. 303-05). During a "mildly manic" phase, she slept three or four hours a night, with racing thoughts and increased hallucinations. In the subsequent depressive phase, she slept up to 20 hours a day. The clonazepam provided some relief for her anxiety and sleep issues. She did not display involuntary facial movements; otherwise her mental status was essentially unchanged. Dr. Krause prescribed a trial of Seroquel to target the hallucinations. Dr. Krause modified her diagnosis to methamphetamine abuse in remission. In February 2007, plaintiff reported that she continued to have rapid changes in mood, but thought they were happening less

---

[8] She stated that she heard train whistles and sirens which unnerved her when she was driving. She also heard imaginary children playing outside her window.

often. (Tr. 301-02). She still had daily hallucinations. She was not sleeping as much during the daytime and was sleeping 12 to 14 hours at night. Nonetheless, she had more bad days than good and isolated herself somewhat because she was self-conscious about her facial tics. She reported feeling a general lack of interest. She used Klonopin three or four times a week to treat acute anxiety. Her mother was continuing to stay with her, which was a benefit to both of them. On examination, she was pleasant, interactive and talkative, with good eye contact and occasional smiles. She had prominent facial tics. Dr. Krause increased plaintiff's Seroquel dosage and added Cogentin to treat muscle stiffness. Plaintiff's amphetamine abuse was now in full sustained remission.

In March 2008, plaintiff reported that she was busy with various family matters and taking her mother to appointments. (Tr. 298-300). Her facial tics did not improve on Cogentin so she stopped taking it. She had fewer hallucinations on the higher dosage of Seroquel. In addition, she was somewhat better able to focus and her obsessive-compulsive tendencies had lessened. With respect to her mood, her lows were not as low, but her sleep pattern continued to be erratic — she had two weeks of sleeping two or three hours a night, with one 48-hour period in which she slept around the clock. Her mental status examination was largely unchanged, with no evidence of delusional thought or acute psychosis. Dr. Krause increased the dosage of Seroquel to target the hallucinations, mood swings, and erratic sleep. She delayed increasing the dosage of Depakote because plaintiff had not obtained the necessary blood work.

In July 2008, plaintiff stated that her mother planned to stay with her until they could move together to her mother's home. She reported some conflict with her brother and concern for her future finances. The increased dosage of Seroquel reduced the frequency and intensity of her hallucinations and mood symptoms, but she ran out two weeks before the appointment,

leading to increased auditory hallucinations. She found the "chatter" extremely disturbing and was preoccupied by trying to detect the source of the noises she heard. (Tr. 294-96). She stopped taking the Lexapro and BuSpar because she did not think they were helpful, and decreased the dosage of Wellbutrin to 300 mg, which was the amount she could obtain from her mother's physician. She took clonazepam as needed when she was manic or unable to sleep. She was still unable to afford the blood work Dr. Krause ordered. Dr. Krause provided plaintiff with some samples of Seroquel so she could take 600 mg a day. Plaintiff called a few days later to report that she had increased sedation, blurred vision, dizziness, and leg twitching; she was told to reduce her Seroquel dosage to 500 mg. (Tr. 297). She called again on August 12, 2008, to say that she could not keep her scheduled appointment because she had been unable to sleep for four days and was too manic to drive. (Tr. 290). Plaintiff was told to increase her Klonopin and to call to set another appointment.

Plaintiff did not return until March 2013. (Tr. 287-89). Dr. Krause noted that plaintiff was "lost to care" while acting as the primary caregiver for her mother, who died of complications of dementia in November 2012. Since that time, plaintiff had experienced a progressive worsening of her depression and anxiety. She reported low mood, anhedonia, anergia, poor focus and concentration, procrastination, crying spells, decreased appetite, and weight loss. She had frequent panic attacks and continued to experience auditory hallucinations. She did not have mood lability or mania. She was chiefly concerned with her depression and anxiety, which interfered with her ability to go out in public and get things done. In addition, she was in conflict with her brother over whether to sell her mother's home, in which she had been living for several years. She had supportive friends and relatives. On examination, plaintiff had appropriate dress and grooming, was alert and oriented, and was interactive, pleasant, and

cooperative. Her affect was anxious and tearful. Her speech patterns were normal, her thought processes were coherent, and she had no psychomotor abnormalities. Dr. Krause assessed plaintiff's fatigue as mild, her concentration as fair, and her anxiety as severe. She was paranoid at times. Dr. Krause diagnosed plaintiff with major depressive disorder, recurrent episode, severe, with psychosis; and anxiety disorder, generalized. She assessed plaintiff's GAF as 51. In discussing medications, Dr. Krause noted that plaintiff had previously done well with a combination of Seroquel, Depakote, clonazepam and Wellbutrin, but was now limited to what she could realistically afford. Dr. Krause prescribed citalopram to treat the depression and clonazepam for panic attacks, as needed.

In April 2013, plaintiff appeared with a cousin. (Tr. 284-86). She reported that she actually felt worse after beginning the medications and assessed her mood at level 2 to 3 on a 10-point scale. She was feeling so depressed that she had considered going to the psychiatric facility in Rolla, where she lived. She was also struggling with severe anxiety and for three days had been unable to leave the house to get needed groceries. She experienced occasional paranoia with the belief that others were out to get her. She felt a lot of grief and constantly heard her mother calling for her.[9] She was napping during the day despite sleeping through the night. She tried exercising, changing her diet, and improving her sleep hygiene without effect. She and her brother were still in conflict over the disposition of her mother's home. Dr. Krause again rated plaintiff's anxiety as severe with panic attacks and worsening depression. She diagnosed plaintiff with anxiety disorder, generalized; and schizoaffective disorder, chronic with acute exacerbation; and assessed a GAF of 51. To treat plaintiff's anxiety, she tapered plaintiff off the

---

[9] She reported that she woke up one night to check on her mother. Plaintiff went outside to look for her when she did not find her in the house and was about to call 911 when she remembered that her mother had died.

citalopram and began a trial of Paxil, with clonazepam as needed for panic attacks. She started plaintiff on risperidone for mood swings and psychotic symptoms. On mental status examination, plaintiff was distractible, anxious and tearful, with coherent thought processes and no psychomotor symptoms.

In June 2013, plaintiff reported little improvement. (Tr. 281-83). Her mood swings had increased and she had been manic for the last 48 hours, with reduced sleep and racing thoughts. She was engaged in cleaning and doing extensive yard work without taking breaks to eat or rest. She continued to feel suspicious and anxious when she was out in public.[10] She had poor impulse control and was uninhibited in what she said, to the extent that her friends told her she being was annoying. On examination, plaintiff was mildly irritable, but was interactive and cooperative. Dr. Krause noted that plaintiff had worsening depression, severe anxiety, panic attacks, occasional paranoia, racing thoughts, and impulsive behavior. Dr. Krause arranged for affordable blood tests, started plaintiff on lithium carbonate, and discontinued the risperidone because it caused jaw clenching and restless leg syndrome.

In July 2013, plaintiff appeared with her neighbor Mary. (Tr. 278-80). She reported that her manic symptoms had resolved but she now was very depressed. She felt tired despite sleeping 18 hours a day. She was also eating poorly and had an increase in auditory hallucinations. She was still living in her mother's house, which was scheduled for auction in less than a week and she did not know where she would live. Her attorney was working on strategies to assist her with the situation and had suggested she apply for Social Security disability benefits. Mary was helping plaintiff clean her house and apply for benefits. Dr.

---

[10] She reported that she paid $130 for her medication at a drug store rather than buying it for $4 at Wal-Mart because she worried that people would see it in her cart.

Krause added loxapine to target mood symptoms and hallucinations, continued the lithium and Paxil, and decreased the clonazepam. She instructed plaintiff to call the office with a progress report in two weeks, and to remain up during daytime hours and eat more consistently. Dr. Krause again assessed plaintiff with worsening depression, severe anxiety, panic attacks, and occasional paranoia. On examination, plaintiff was alert, oriented, interactive, and cooperative with occasional smiles. Her GAF was 51.

When plaintiff returned in September 2013, she was accompanied by another cousin. (Tr. 363-65). Shortly before the appointment, she called to complain of increased manic symptoms; this followed a two-week period of feeling very depressed. Dr. Krause raised plaintiff's lithium dosage at that time. With the exception of sleeping well for two nights, plaintiff had not experienced an improvement in her symptoms and complained that she was quite sedated during the day. She continued to experience auditory hallucinations. She was under great stress due to her finances, conflict with her brother, the impending foreclosure, and acting as executor for her mother's estate. She had severe panic attacks, with shortness of breath, heart palpitations, and feeling scared. Dr. Krause prescribed a slight increase in clonazepam to address the panic attacks and increased the loxapine for the mood swings and psychotic symptoms; the lithium and Paxil remained unchanged. Dr. Krause directed her to go to an emergency room if she felt suicidal or unsafe. Dr. Krause assessed plaintiff with severe anxiety, hallucinations, and occasional paranoia. On examination, plaintiff was alert, oriented, and cooperative. Dr. Krause noted that she had positive interactions with her cousin during the visit. Her GAF was 53.

In October 2013, plaintiff was again accompanied by her friend Mary. (Tr. 360-62). Her depression had worsened, with low mood, anhedonia, anergia, and crying spells. She was

evicted from her mother's home and was in the process of moving her belongings back to her own home, which she had rented to a long-time friend. The increased familial, housing, and financial stress made her symptoms worse. She experienced an increase in generalized trembling due to her anxiety. Dr. Krause noted that plaintiff was trembling initially but she visibly calmed and the trembling ceased as the visit progressed. Plaintiff reported that she had thought about cutting her wrist about two weeks earlier but had not acted on the thought. Dr. Krause suggested that she consider an inpatient admission for crisis stabilization and "to get more aggressive with treatment for her symptoms." (Tr. 360). Plaintiff declined because she had fewer than 30 days to move her belongings from her mother's home. Instead, plaintiff agreed to sleep in her own home where her friend was present and to call Mary if she felt suicidal or unsafe. In addition, Mary agreed to spend part of each day with her. Dr. Krause provided samples of Seroquel.[11] Dr. Krause assessed plaintiff with worsening depression, panic attacks, severe anxiety, hallucinations, and occasional paranoia. On examination, plaintiff continued to be interactive and cooperative, with appropriate and positive interactions and occasional smiles. Her GAF was 53.

In November 2013, plaintiff was accompanied by her cousin. She reported that she was very overwhelmed trying to move her belongings to her home. (Tr. 357-59). She often slept for 20 hours a day. Her friends and family were supportive but told her she needed to do more to help herself. She had transient tremors that increased when she felt anxious. She had transient auditory hallucinations which occasionally told her to hurt herself, but they had decreased in

---

[11] Dr. Krause noted that plaintiff could not afford Depakote and Seroquel, a combination that had previously been effective in controlling her symptoms.

frequency and intensity since starting Seroquel.[12] Plaintiff rated her mood at 6 on a 10-point scale. Dr. Krause discussed strategies for managing overwhelming tasks and directed plaintiff to improve her sleep hygiene by avoiding daytime napping. Dr. Krause assessed plaintiff with fluctuating depression, panic attacks, severe anxiety, occasional suicidal ideation, hallucinations, and occasional paranoia. On examination, plaintiff was alert, oriented, and cooperative. Dr. Krause noted that she had positive interactions with her cousin during the office visit. Her GAF was 53.

In December 2013, plaintiff reported that her mood was "on a more even keel," but she complained that she could only feel extreme emotions. (Tr. 354-56). She continued to sleep 18 hours a day and had made little effort to improve her sleep hygiene. Furthermore, she had made little progress on packing her belongings, despite being past the deadline for moving out of her mother's home. Mary and her husband ate dinner with plaintiff every day and provided emotional support when she was anxious or depressed. Her relationship with her brother had improved. She had briefly stopped taking her morning medications to address the daytime sedation, but quickly resumed them when her symptoms recurred. Dr. Krause made changes to plaintiff's medication to minimize the daytime sedation and emotional numbing and instructed plaintiff to take her medications as prescribed. Dr. Krause agreed to see plaintiff in six weeks, rather than four, due to plaintiff's financial concerns. Dr. Krause assessed plaintiff with increased sleep issues, moderate to severe fatigue, fluctuating depression, panic attacks, severe anxiety, hallucinations, and occasional paranoia. On examination, plaintiff was alert, oriented, interactive and cooperative, with an anxious affect and occasional smiles.

---

[12] A nurse in Dr. Krause's office helped plaintiff apply for the Seroquel patient assistance program and gave her a voucher and samples.

Plaintiff appeared as scheduled in February 2014. (Tr. 351-53). She reported that she had stopped taking her medications for a four-week period, initially so she could drink alcohol on New Year's Eve and then because she had the flu. She had restarted the medications without ill effect. Her sleep remained erratic and she rated her mood at level 4 on a 10-point scale. She felt very anxious and panicky at times, but denied feeling irritable or angry. Her auditory hallucinations had decreased in frequency. She had not worked on improving her sleep hygiene or on packing her belongings. Friends and family members were providing her with the money she needed for medication and were "watching her closely" — for example, the Whites ate dinner with her every day and her cousin called the office with concerns about plaintiff's mood. Plaintiff was resistant to transferring her care to a mental health center nearer her home where she could pay a reduced fee. Dr. Krause again instructed plaintiff to improve her sleep hygiene and take care of her physical well-being. Dr. Krause assessed plaintiff as having erratic sleep, moderate to severe fatigue, panic attacks, severe anxiety, occasional paranoia, decreased hallucinations, and mood swings. On examination, plaintiff was alert, oriented, interactive and cooperative, with an anxious affect and occasional smiles. She was also distractible. Her GAF was 56.

At her visit in March 2014, plaintiff reported that she was now living in her home with a roommate and his dog, but this house also was in foreclosure. (Tr. 348-50). She had stopped taking all her medications because she felt emotionally numb and then restarted them when she became more depressed. She was very depressed, with anhedonia, anergia, indecisiveness, poor focus and concentration, erratic sleep, decreased appetite, and weight loss. Her sleep schedule was erratic and she was not following through on strategies to improve her sleep hygiene or go

through her possessions. Friends and family members offered to provide the money she needed to avert foreclosure. Plaintiff's presentation and medical status examination were unchanged.

Plaintiff called Dr. Krause's office on May 20, 2014, to say that she did not have the money to get her medications refilled or complete blood tests. (Tr. 345-47). When she appeared as scheduled on May 30, 2014, plaintiff had not taken lithium for a week and was using her clonazepam sparingly. Nonetheless, she reported that her mood had improved, rating it at 6.5 to 7 on a 10-point scale. Her house was no longer in foreclosure and she was on a payment plan, although her finances remained precarious and she was concerned about making the required payments. She continued to take two naps during the day despite sleeping well at night. However, she was able to walk the dogs and complete more chores. Plaintiff rarely drove. Dr. Krause decided not to resume lithium because of plaintiff's finances. She increased the dosage of plaintiff's Seroquel, which she received through a patient assistance program, and continued the clonazepam. Dr. Krause encouraged her to refrain from daytime napping and to maintain a structured routine during the day. She assessed plaintiff as having increasing sleep issues, but her mood swings, fatigue and anxiety had improved somewhat and she denied any hallucinations at present. On examination, plaintiff was oriented and interactive with a less anxious affect and occasional smiles and laughter. She remained distractible. Her GAF was 58. In addition to schizoaffective disorder, chronic with acute exacerbation, and anxiety disorder, generalized, Dr. Krause diagnosed plaintiff with personality disorder, not otherwise specified.

On July 23, 2014, Dr. Krause admitted plaintiff for inpatient treatment after she reported feeling suicidal. (Tr. 324-37, 342). On intake, plaintiff stated that she was planning to visit her parents' graves and had contemplated taking pills she had stashed. She reported that she had been manic for some time, but had been experiencing worsening depression for 11 days.

Lithium had helped, but plaintiff could not afford the required blood tests; indeed, she was selling her belongings to support herself. On examination, plaintiff made eye contact and was cooperative and polite. She was assessed as marginally reliable. Her mood was depressed with a somewhat restricted affect. Her impulse control was intact and no psychotic symptoms were elicited. She had somewhat decreased production of speech, with mildly slowed rhythm and rate of production. She was coherent, with goal-oriented and logical thoughts, without blocking or perseveration. She was grossly oriented, with intact memory, mildly concrete abstraction, and intact comprehension. Her insight and judgment seemed impaired. She was diagnosed with schizoaffective disorder, bipolar type by history, bereavement, and a question of cannabis abuse. She was assessed a GAF score of 35.[13] Plaintiff agreed to resume taking lithium because she felt it was helpful. It was noted that plaintiff's admission was likely to be short because she was minimizing her symptoms and wanted to attend a niece's wedding. In addition to her psychotropic medications, she was started on levothyroxine. Plaintiff was discharged on July 26, 2014.

On July 28, 2014, Dr. Krause noted that plaintiff reported feeling "significantly better." (Tr. 342-44). She attended her niece's wedding upon leaving the hospital and went to church the following day. Her brother agreed to help her pay for her medications. She was not experiencing any suicidal ideation, hallucinations, or paranoia. She was sleeping a bit better, had stable appetite and weight, and was not feeling oversedated. Dr. Krause noted that plaintiff's mood swings had improved but she still had panic attacks and moderate anxiety. On examination, plaintiff had appropriate dress and grooming. She was oriented and interactive

---

[13] A GAF of 31–40 reflects a major impairment in several areas such as work, family relations, judgment, or mood. DSM-IV-TR at 34.

with improved mood, which plaintiff rated at level 7.5 on a 10-point scale. Her affect was less anxious and was brighter with occasional smiles. Her GAF was 58.

On September 4, 2014, plaintiff reported that she was taking her medication as prescribed without any adverse effect. (Tr. 339-41). She had reduced the amount of clonazepam in order to address oversedation but the reduced amount was not sufficient to resolve her anxiety, which was quite severe. She did not have any suicidal ideation or symptoms of psychosis. She continued to be very worried about her housing and finances and was working with Mary on a yard sale to raise money. Dr. Krause decided to leave her medications and dosages unchanged. She assessed plaintiff as having decreased sleep issues and moderate fatigue, with improving depression and improved mood swings. She still had panic attacks. On examination, plaintiff was oriented and interactive, with improved mood rated at 7 on a 10-point scale. She remained distractible. Her GAF was 60.

Plaintiff returned as scheduled on November 6, 2014. (Tr. 388-90). She had mood lability, irritability, and angry outbursts, and was feeling edgy and tense a lot of the time. She also had more crying spells, sadness and depression while sorting her mother's belongings. She had gotten health insurance since her last visit but remained very anxious about her finances. Dr. Krause increased her levothyroxine dosage and her Seroquel dosage to target mood lability and depression more aggressively. Dr. Krause assessed plaintiff with mild fatigue and decreased sleep disturbance, moderate anxiety, worsening depression, occasional paranoia, panic attacks, and distractible attention. Plaintiff did not have hallucinations. On examination, plaintiff was oriented, interactive and cooperative, with irritable, depressed mood and congruent affect. Her GAF was 56. Dr. Krause removed the diagnosis for personality disorder.

On January 21, 2015, plaintiff reported that her depression, appetite, and weight increased over the holidays. (Tr. 384-87). She continued to return to bed during daytime hours, even though she was sleeping through the night. Her transient hallucinations had decreased in frequency and intensity since her last visit. Lab tests showed that her thyroid stimulating hormone was still elevated despite modifications to her medication. Dr. Krause assessed plaintiff with mild fatigue, increased sleep disturbance, moderate anxiety, moderate depressed mood, occasional paranoia, decreased hallucinations, panic attacks, and distractible concentration. On examination, plaintiff was alert, oriented, interactive, and cooperative with normal eye contact and distractible attention. Her GAF score was 58.

In March 2015, plaintiff reported that her mood symptoms appeared to be stabilizing on her regimen of lithium and Seroquel. (Tr. 380-83). She was sleeping better at night and had better energy and was more productive during the day. She had transient visual and auditory hallucinations. She had reduced her smoking to four cigarettes a day. She displayed mild mouth and facial movements and reported transient problems with swallowing, which Dr. Krause thought was caused by the Seroquel. Dr. Krause reduced plaintiff's dosage, although plaintiff was "very resistant" to changing her medications because she thought they were working. Dr. Krause assessed plaintiff with mild fatigue, improving sleep, mild memory loss, moderate anxiety, depressed mood which was improving, occasional paranoia, attention issues, and distractible concentration. On examination, plaintiff was oriented, cooperative and interactive, with a better mood and congruent affect.

In April 2015, plaintiff continued to display involuntary facial and mouth movements and had some difficulty swallowing. (Tr. 376-79). She reported that she was sleeping well and was keeping busy unpacking boxes. She had transient increases in her depression, which she

attributed to the Easter holiday. She continued to experience transient hallucinations and paranoia. Dr. Krause told plaintiff that she had to discontinue Seroquel because of the facial movements and impaired swallowing. She proposed starting Latuda to treat mood swings and psychotic symptoms. Although apprehensive about changing her medications, plaintiff agreed to Dr. Krause's plan. Dr. Krause assessed plaintiff with mild fatigue, weight gain, and no sleep disturbance. She had moderate anxiety, a depressed mood that was improving, occasional paranoia, panic attacks, and distractible concentration. On examination, plaintiff had mild facial tics, was alert and oriented, and made normal eye contact. She was interactive and cooperative.

2. Opinion Evidence

On September 12, 2013, State agency psychologist Barbara Markway, Ph.D., completed Psychiatric Review Technique forms based on a review of the record. (Tr. 50-59, 60-65). Dr. Markway concluded that plaintiff had medically determinable impairments in the following categories: 12.03 (schizophrenic, paranoid and other psychotic disorders); 12.06 (anxiety-related disorders); and 12.09 (substance addiction disorders). She opined that these impairments could reasonably be expected to cause some of plaintiff's alleged symptoms, but that plaintiff's statements regarding the severity of her symptoms were not credible to the extent that they were inconsistent with the mental residual functional capacity (MRFC) assessment. In completing the MRFC, Dr. Markway opined that plaintiff retained the abilities to understand, remember and carry out simple instructions; maintain adequate attendance and sustain an ordinary routine without special supervision; interact adequately with peers and supervisors in a work setting where social interaction is not a primary job requirement; and adapt to minor changes in a work setting. (Tr. 57). The ALJ gave great weight to Dr. Markway's findings. (Tr. 19).

Dr. Krause completed medical source statements on April 1, 2014.[14] (Tr. 313-14, 316-18, 320-22). Dr. Krause indicated that plaintiff presented the following signs and symptoms: anhedonia or pervasive loss of interest; appetite disturbance with weight change; sleep disturbance; psychomotor alteration; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; hallucinations, delusions or paranoid thinking; generalized persistent anxiety; motor tension; apprehensive expectation; and recurrent severe panic attacks. (Tr. 316). Dr. Krause opined that plaintiff's psychiatric conditions caused extreme limitations in her activities of daily living and maintaining social functioning. (Tr. 316-17, 320-21). In addition, plaintiff had deficiencies of concentration, persistence, and pace that resulted in frequent failure to complete tasks in a timely manner; repeated episodes of decompensation or deterioration in work or work-like settings; the occasional inability to function independently outside her home due to panic attacks; and a documented history of two or more years of inability to function outside of a highly supportive living situation. Id. Finally, Dr. Krause rated plaintiff as markedly or extremely impaired in 20 of 20 work-related abilities. (Tr. 313-14, 316-18, 321-22). The ALJ gave little weight to Dr. Krause's opinion, citing GAF scores in the moderate range; plaintiff's ability to handle her mother's estate, move, and manage the majority of the housework; and plaintiff's loss of support from her mother and a "secondary gain in obtaining income that would be higher than what she earned for most of her life." (Tr. 19).

In December 2014, the ALJ ordered a consultative psychological evaluation, which Thomas J. Spencer, Psy. D., completed on January 22, 2015. (Tr. 367-70). Plaintiff was driven

---

[14] Dr. Krause completed three medical source statements addressing mental wellness, depression with anxiety, and schizoaffective disorder. The Court has condensed her responses.

to the appointment by a friend and presented as very anxious with a noticeable full body tremor. Plaintiff reported that she felt anxiety "most of the time" and was fearful and "very restless and antsy when she has to leave home." (Tr. 367-68). She worried about having public panic attacks, with included crying, chest pain, shortness of breath, and a racing heart. She stated that her mind raced with worries about what could go wrong and how she could "screw things up." (Tr. 368). She felt fatigued despite sleeping 11 to 12 hours a day. She was unmotivated and depressed most of the time, increasingly so at Christmas. She was not suicidal at present. She sometimes heard derogatory voices suggesting she commit suicide; she also heard her mother's voice, which was supportive. She had last heard voices a week before the evaluation. When she was out in public, she felt as though she was being watched and talked about or judged. She did not fear that someone would try to hurt her. She stated that during manic episodes she felt elated and cleaned compulsively, became hypertalkative with pressured speech, and needed less sleep. During these episodes, she also spent money impulsively, but had never bounced checks or filed for bankruptcy, nor did she drink, use drugs, gamble, or engage in promiscuity. Her low periods lasted longer than her high periods.

On examination, plaintiff made intermittent eye contact, her speech wavered, and she displayed a full body tremor and was "very antsy." (Tr. 369). She was cooperative and appeared to be a decent historian. Her insight and judgment appeared to be intact. She was anxious, alert and oriented, and did not appear to be responding to internal stimuli. She did not present as grandiose or paranoid and her flow of thought was intact and relevant. She appeared to be of average intelligence and demonstrated a good working knowledge of social norms. There was no evidence of deficits in long-term memory or language. Dr. Spencer diagnosed plaintiff with schizoaffective disorder and generalized anxiety disorder and assigned a GAF score of 50-55.

Dr. Spencer completed a medical source statement. (Tr. 371-73). He found that plaintiff's mental impairments caused mild limitations in her abilities to understand, remember and carry out simple instructions. He also found that her impairments caused marked limitations in her abilities to interact appropriately with supervisors, coworkers, and the public; and to respond appropriately to usual work situations and changes in a routine work setting. In addition, she had poor compliance with the activities of daily living. Finally, he opined that she could not manage benefits in her own best interest. The ALJ gave partial weight to Dr. Spencer's opinion that plaintiff could perform simple tasks, but gave little weight to his opinion that plaintiff had marked limitations in social functioning. In support, he cited her GAF scores; her good working knowledge of social norms; and her abilities to maintain friendships, attend church, handle her mother's estate, and shop. (Tr. 19). The ALJ did not address Dr. Spencer's conclusion that plaintiff had marked limitations in her ability to respond appropriately in work settings or to changes in a routine work setting.

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in

any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942.

Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

# IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since August 30, 2004, the alleged date of onset.[15] (Tr. 14) At steps two and three, the ALJ found that plaintiff had severe impairments of schizoaffective disorder, depression, and anxiety disorder and that none of her impairments or combination of impairments met or was medically equivalent to a listed impairment.[16] Id.

The ALJ next determined that plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: she should never work at heights or around moving mechanical parts. She is limited to simple, routine, and repetitive tasks as defined in the Dictionary of Occupational Titles (DOT) as an SVP level of 1 or 2. She can occasionally make work-related decisions, can occasionally respond appropriate[ly] to supervisors, coworkers, and the public, and is limited to occasionally tolerating few changes in a routine work setting. She cannot tolerate strict production quotas with the emphasis being on a per shift basis rather than per hour.

(Tr. 16).

In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. He

---

[15] The ALJ noted that, for the purposes of disability benefits under Title II, plaintiff's last date insured was June 30, 2006, and the first report of any medical treatment was December 4, 2007, more than a year after her insured status expired. The ALJ stated that there was no medical evidence from which he could make a determination of disability and found that plaintiff was not entitled to a period of disability and disability insurance and went on to adjudicate her claim for supplemental security benefits. (Tr. 16). Plaintiff does not address this aspect of the ALJ's decision.

[16] The ALJ analyzed plaintiff's eligibility for Listing 12.03 (schizophrenic, paranoid and other psychotic disorders), Listing 12.04 (depressive, bipolar and related disorders), and Listing 12.06 (anxiety-related disorders), and the "paragraph B" criteria. Id. For the purposes of considering the paragraph B criteria, the ALJ found that plaintiff displayed mild restrictions in her activities of daily living; moderate limitations in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 15). Plaintiff had not had episodes of decompensation of extended duration. Id.

did not address the third-party function report completed by Mary White. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he also determined that her statements regarding their intensity, persistence and limiting effect were "not entirely credible." (Tr. 19). In reaching this conclusion, the ALJ gave little weight to the assessments of Drs. Krause and Spencer that plaintiff had "marked" or "extreme limitations."

At step four, the ALJ concluded that plaintiff could not return to her past relevant work. (Tr. 20). Her age placed her in the "younger individual" category on the alleged onset date and the "closely approaching advanced age" at the time of the decision. She had a high school education and was able to communicate in English. Id. Thus, the Medical-Vocational Guidelines supported a finding that she was not disabled. Based on the vocational expert's answers to hypothetical questions, the ALJ found at step five that someone with plaintiff's age, education and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a stubber, machine packager, and industrial cleaner. (Tr. 21). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act. Id.

## V. Discussion

Plaintiff asserts two challenges to the ALJ's decision. First, she argues that the ALJ's RFC formulation varies significantly from the hypothetical posed to the vocational expert. As a result, the expert's testimony does not provide evidence that jobs exist in the economy for an individual with the RFC as formulated. Second, she argues that the ALJ erred by failing to address the limitations Dr. Spencer found with respect to her ability to respond appropriately to the usual work situations and to changes in a routine work setting. The Court agrees that the

ALJ improperly assessed Dr. Spencer's opinion and will remand this matter for further proceedings. On remand, the ALJ will have an opportunity to reformulate the RFC and thus it is not necessary to take up plaintiff's challenge to the RFC.

In order to address the ALJ's analysis of Dr. Spencer's opinion, the Court has found it necessary to also address the ALJ's consideration of the opinions of Drs. Krause and Markway. As noted above, the ALJ gave "little weight" to the opinion of Dr. Krause in its entirety and that of Dr. Spencer to the extent that he found that plaintiff had marked limitations in social functioning; the ALJ gave great weight to the opinion of Dr. Markway, a non-examining evaluator. (Tr. 19).

Dr. Krause is a treating physician whose opinion must be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."[17] Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)). "Not inconsistent . . . is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Id. (quoting S.S.R. 96–2p, Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188 (July 2, 1996)). "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."

---

[17]This continues to be true for plaintiff's claim because it was filed before March 27, 2017. Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

Id. (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (alteration in original)). The treating physician's opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." Id. (citations omitted). The ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (quoting Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015)). If a treating physician's opinion is not given controlling weight, however, the ALJ must consider the following factors in determining what weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the Secretary's attention which tend to support or contradict the opinion. Constable v. Colvin, No. 4:14 CV 1128 CDP, 2015 WL 5734977, at *15 (E.D. Mo. Sept. 29, 2015); 20 C.F.R. § 404.1527(d)(2)–(6).

Here, the ALJ determined that Dr. Krause's opinion was inconsistent with her own treatment records "that consistently show GAF scores that reflect 'moderate' limitations." (Tr. 19). The Eighth Circuit has determined that GAF scores are of little value. Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016). "[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, a score may have little or no bearing on the subject's social and occupational functioning. . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment

Functioning] score in the first place." Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) (citations omitted) (alterations in original). Indeed, the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs and has indicated that GAF scores "have no direct correlation to the severity requirements of the mental disorders listings." Nowling, 813 F.3d at 1116 (citations omitted). Thus, the GAF scores do not constitute substantial evidence that contradicts or conflicts with Dr. Krause's opinion. Indeed, Dr. Krause's opinion is largely consistent with her treatment notes, which reflect that plaintiff had occasional paranoia and experienced frequent panic attacks and severe anxiety. These symptoms are consistent with marked or extreme limitations in social functioning. In addition, plaintiff was distractible and had attention issues, which could be expected to interfere with maintaining pace and persistence. Plaintiff also had auditory and visual hallucinations, symptoms consistent with marked or extreme limitations in an ability to respond appropriately to usual work situations or changes in routine. Although her hallucinations responded to antipsychotic medication, various side effects and her finances prevented plaintiff from maintaining a consistent course of treatment. In addition, plaintiff had frequent disturbances in her sleep cycle, which would interfere with timeliness and attendance. The ALJ attributed plaintiff's sleep patterns to a lack of motivation, "which is not a reason to award disability." (Tr. 19). The frequent changes Dr. Krause made to plaintiff's medication in order to address her sleep disturbance suggest that there may also be a medical component.

The ALJ also rejected Dr. Krause's opinion as inconsistent with plaintiff's activities of daily living, "including handling her mother's estate, moving, and doing the majority of the housework." (Tr. 19). In evaluating a claimant's RFC, "consideration should be given to . . . the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others

*over a period of time* and . . . the frequency, appropriateness, and independence of the activities must also be considered. <u>Leckenby v. Astrue</u>, 487 F.3d 626, 634 (8th Cir. 2007) (alterations and emphasis in original; internal quotations and citation omitted). Plaintiff's functioning fluctuated with changes in her medication and external stressors and there is no evidence that any improvements were sustained over time. Mary White's third-party function report[18] and Dr. Krause's treatment notes establish that plaintiff relied heavily on assistance from friends and family to complete even basic tasks, such as washing dishes, eating meals, and taking medication. She was similarly reliant on friends and family to accomplish her move. And, while it is true that plaintiff was the executor of her mother's estate, there is no evidence in the record regarding what duties she performed or whether she was successful in the role. With respect to plaintiff's ability to complete housework on occasion and attend church, the Eighth Circuit has "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." <u>Dishong v. Berryhill</u>, No. 8:15-CV-399, 2017 WL 1843068, at *10 (D. Neb. May 5, 2017) (<u>quoting</u> <u>Reed v. Barnhart</u>, 399 F.3d 917, 923-24 (8th Cir. 2005) (internal quotations omitted)). The Eighth Circuit has found it "necessary from time to time" to remind the Commissioner "that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Id.</u> The Court concludes that the ALJ erred by relying on plaintiff's GAF scores

---

[18] The ALJ's failure to address Mary White's report, in combination with the other errors, is an additional reason supporting remand. <u>Willcockson v. Astrue</u>, 540 F.3d 878, 881 (8th Cir. 2008)

and activities of daily living to discount Dr. Krause's opinion. He made the same errors in discounting Dr. Spencer's opinion.[19]

The primary medical evidence that directly contradicted Dr. Krause's opinion is that of Dr. Markway, the State non-examining psychologist, who opined that plaintiff had nondisabling limitations and to whose opinion the ALJ gave great weight. "Normally, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not constitute substantial evidence on the record as a whole." Jones v. Colvin, No. 4:15-CV-00449-AGF, 2016 WL 728294, at *10 (E.D. Mo. Feb. 24, 2016) (citations omitted). In evaluating nonexamining source opinions, the ALJ must "evaluate the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(d)(3); see also § 404.1527(f) (discussing rules for evaluating nonexamining state agency opinions). Dr. Markway's opinion was based on records from March 2007 through July 2013. (Tr. 53). Thus, she did not have the benefit of Dr. Krause's subsequent treatment notes or medical source statement, the records from plaintiff's 2014 hospitalization, or Dr. Spencer's 2015 evaluation. On remand, the ALJ should reconsider Dr. Markway's opinion in accordance with the standards discussed above.

## VI. Conclusion

The ALJ did not properly evaluate the weight to give the opinions of Drs. Krause, Spencer, and Markway, and this matter must be remanded for further proceedings. In re-evaluating these opinions, the ALJ must either give Dr. Krause's opinion controlling weight as the opinion of a treating source or provide an acceptable reason under 20 C.F.R. § 404.1527(c)

---

[19] As an examining source, Dr. Spencer's opinion is entitled to greater weight than that of a non-examining source such as Dr. Markway. 20 C.F.R. § 404.1527(a)(c)(1).

for giving it less weight.  <u>Jones</u>, 2016 WL 728294 at *11.  In addition, the ALJ should consider the third-party function report submitted by Mary White.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of January, 2018.